## In the Matter of Margaret C. Scott.

Suffolk. February 21, 1979.

Present: Hennessey, C.J., Quirico, Braucher, Kaplan, Wilkins, Liacos, & Abrams, JJ.

*Judge. Supreme Judicial Court,* Superintendence of inferior courts.

In a disciplinary proceeding against a judge, a stipulation of facts filed by the parties established that the judge had violated the Code of Judicial Conduct in that her courtroom conduct showed a pattern of disregard of, or indifference to, fact or law, largely in criminal and juvenile cases, resulting in individual injustices, that the attitudes displayed by the judge from the bench had brought the administration of justice into disrepute, and that the judge's out-of-court conduct related to business enterprises had not been consistent with the behavior required and expected of judicial officers. [367]

Disciplinary proceedings, rather than ordinary appellate review, were appropriate where a judge over a protracted period had followed a course of conduct which was in disregard of the law and established rules of practice. [367-369]

In view of certain extenuating circumstances in a proceeding against
a judge for misconduct, this court limited sanctions against the
judge to public censure and restriction on the sessions and courts
to which the judge could be assigned. [369-370]

The terms "public reprimand" and "public censure" have the same
meaning when used by this court to express disapproval of judicial
conduct. [369]

PROCEEDING in relation to an inquiry concerning a
judge, commenced in the Supreme Judicial Court for the
county of Suffolk on July 5, 1978. The matter was trans-
ferred to the full court by *Kaplan*, J., on February 14,
1979, and considered on a stipulation of facts.

*Michael B. Keating*, Special Counsel, submitted a
recommendation of the Committee on Judicial Responsi-
bility.

*Thomas C. Troy* and *Jerry C. Effren*, for the respondent,
submitted a brief.

BY THE COURT. The case is before us on the recommen-
dation of the Committee on Judicial Responsibility (Com-
mittee)[1] that District Court Judge Margaret C. Scott be
subjected to discipline for her misconduct.

The court on March 22, 1977, referred to the Commit-
tee on Judicial Responsibility, pursuant to S. J. C. Rule
3:17, as amended, 372 Mass. 925 (1977), a suggestion of
the Massachusetts Bar Association (through its commit-
tee on judicial complaints) that Judge Scott had conduct-
ed herself improperly in her judicial office. After investi-
gation, the Committee on April 6, 1978, served on Judge
Scott a "Notice of Institution of Formal Proceedings" set-
ting forth charges, which was amended on June 1, 1978
(Documents A and B).[2] An answer and amended answer

---

[1] This case was investigated, prosecuted, and carried to a conclusion
by the Committee, which has now been superseded by the Commission
on Judicial Conduct established under G. L. c. 211C, inserted by St.
1978, c. 478, § 114.

[2] Of the lettered documents cited, Document E ("Stipulation of
Facts") appears as an appendix to this opinion; the others are availa-
ble as part of the record of the case.

were filed on behalf of Judge Scott on May 30, 1978, and June 8, 1978, respectively (Documents C and D). On June 5, 1978, a single justice of this court had appointed the Honorable Cornelius J. Moynihan, a retired judge of the Superior Court, as hearing officer, and thereafter hearings were held before him. The hearings were suspended when counsel sought to reach an agreement on the facts as mentioned immediately below.

Because the facts were to some extent matters of record, and with a view to avoiding the necessity for a lengthy trial and expediting a disposition of the proceedings, the parties—the Committee and Judge Scott—on January 4, 1979, entered into a "Stipulation of Facts" (Document E) comprising a statement of agreed facts with respect to the allegations of the "Notice" as amended, which had been controverted in part in the answer as amended. On the basis of the "Stipulation," there was presented to the single justice on January 17, 1979, a "Recommendation for Judicial Discipline and Statement of Reasons Therefor of the Committee on Judicial Responsibility" (Document F), together with a "Brief" (Document G) setting forth the views of Judge Scott.

On January 30, 1979, the court, through the single justice, advised the parties that it was prepared to accept the "Stipulation" as the factual basis for a disposition which would cover all the charges contained in the "Notice" as amended; but such acceptance should be understood not to constitute a representation by the court as to the disposition it would make, which might differ from that recommended by the Committee. Counsel on February 9, 1979, signified that they agreed to the submission of the matter on this basis. They waived oral argument. Accordingly, the single justice on February 14, 1979, ordered the matter transferred to the full court for disposition.

Charges I-IV of the "Notice" charged Judge Scott with disregard of the law, abuse of the contempt power and the power to impose costs, disregard of the laws concerning

bail, and failure to treat litigants and lawyers with respect and courtesy, all as exemplified in sundry described incidents. Charges V-VII charged Judge Scott with certain improper activities occurring while she was a full-time special justice (after May 1, 1976) but unrelated to her judicial duties. In its "Recommendation," the Committee submits that charges I-VII are established in substance by the conduct set forth and admitted in the "Stipulation."

On this basis, the Committee recommends that this court discipline Judge Scott in the form of a public reprimand addressed to her. Judge Scott in the "Brief" submitted in her behalf states that the stipulated facts warrant appropriate discipline, and that the discipline recommended by the Committee is appropriate, and suggests that the Committee's recommendation of a public reprimand be adopted by this court.

We think it unnecessary to rehearse the facts as stipulated. We agree that they establish the charges in substance. The courtroom conduct thus described in detail shows a pattern of disregard of, or indifference to, fact or law, largely in criminal and juvenile cases, which has resulted in individual injustices. The attitudes displayed by the judge from the bench have brought the administration of justice into disrepute. And the judge's out-of-court conduct related to business enterprises has not been consistent with the behavior required and expected of judicial officers.[3]

In reaching a judgment as to Judge Scott's courtroom misbehavior, we are conscious of the difficulty in distinguishing between mere errors of fact or law, on the one side, which would not call for discipline, and, on the other side, what we have called patterns of disregard or indifference, which do warrant discipline. The distinction was put thus in *Matter of Troy*, 364 Mass. 15, 40-41 (1973):

[3] The several canons of the Code of Judicial Conduct involved, cited in the "Notice" and its amendment, are canons 1, 2, 2(A), 3(A)(1), (3), (4), 5(C)(1), (2), and 6 (359 Mass. 841 [1972]).

"When the action or decision of a judge involving the exercise of his judgment and his discretion is questioned or challenged as contrary to law, there are legally constituted avenues to test such action short of an initial appeal to the Supreme Judicial Court to invoke its extraordinary powers of supervision or its powers to discipline. ... To invoke the disciplinary power of this court against a judge as a substitute for appellate review would establish a practice dangerous to the independence of the judiciary and equally dangerous to the public's constitutional right to an independent judiciary. ...

"[W]e do not imply that judges should be immune from criticism arising out of their exercise of judicial discretion and judgment. Persons and groups of persons in the community have a right, and in some instances a duty, to direct public attention to judicial conduct. Continued public scrutiny assists in insuring that justice will consistently be done. Furthermore, if it is established by credible evidence that a judge, over a protracted period of time, has followed a course of judicial conduct which is in utter disregard of the law and of established rules of practice in continued violation of orders pertaining thereto by those empowered to give such orders, then this court is prepared to deal with such a situation under its inherent and statutory power to discipline judges."

Here the judge over "a protracted period of time," some six years, has followed "a course of judicial conduct" which was without justification in law (and held so repeatedly when review was in fact obtained). It resulted in the violation of legal rights, including constitutional rights, of the parties before her. Individuals were denied fair treatment and often denied personal freedom in violation of their rights. These individuals were generally indigent and thus the least able among our citizens to protect their rights by resort to higher judicial authority. On occasion counsel were berated for the very reason that they were attempting to represent such individuals. There were not only distinct acts of misconduct, but the

appearance of partiality or bias damaging to public trust in the judicial process. We take a most serious view of these improprieties. So also we disapprove the judge's involvement in prohibited extrajudicial business activities.

The Committee in its "Recommendation" evinces clearly its appreciation of the gravity of these offenses, but, in fairness, sets out the extenuating factors which explain why it does not recommend more severe discipline. It points out that the out-of-court misconduct did not involve corruption or moral turpitude, was not directed to personal gain, was mostly on a small scale and related to family ventures, and has now been abandoned. The courtroom misconduct was largely committed several years ago, without significant recurrence in recent years. Further, the Committee lays emphasis on the fact that the judge by entering into the stipulation and joining in the Committee's recommendation has accepted responsibility for the misconduct.

We acknowledge the significance of these palliating circumstances, and especially the judge's willingness to accept that she has been seriously at fault, and her apparently improved behavior in the more recent past.

The Committee has discussed in its "Recommendation" whether the proper sanction to be applied is public reprimand or public censure. We have used the terminology of public censure in prior cases of judicial misconduct (see *Matter of Larkin*, 368 Mass. 87 [1975]; *Matter of Morrissey*, 366 Mass. 11 [1974]), but the choice of one form of words rather than another to express a result is not important, nor does it carry any special significance. What is important is that this court publicly reprehends Judge Scott's behavior and will not tolerate any repetition.

In addition to this sanction of a public statement by the court addressed to Judge Scott, we believe it is appropriate and necessary to add further sanctions. Until further order of this court, but in any event for a period of not less than one year—

(1) Judge Scott shall not be assigned to criminal or juvenile sittings anywhere in the Commonwealth. This sanction is imposed because of the judge's past record in handling cases involving personal rights and in order to provide an interval in which she may continue to reconsider her attitude toward such cases.

(2) Judge Scott shall not be assigned to any sittings, whether criminal, juvenile, or civil, in the Municipal Court of the Dorchester District of Boston or the First District Court of Barnstable. These are the courts in which the judge was presiding when most of the unfortunate incidents occurred that are set forth in the "Stipulation."

The case will be remitted to the single justice for the entry of an appropriate order.

*So ordered.*

APPENDIX Document E
COMMONWEALTH OF MASSACHUSETTS
BEFORE THE COMMITTEE ON
JUDICIAL RESPONSIBILITY

INQUIRY CONCERNING A JUDGE,
NO. 77-1                    STIPULATION OF FACTS

The Committee on Judicial Responsibility, by its Special Counsel, and Judge Margaret C. Scott, by her counsel, hereby stipulate and agree to the following facts pertaining to the above-entitled matters:

### CHARGES I - IV

1. S. K., a nine year old boy, was under the supervision of the Barnstable Probation Office for several offenses which had been continued without findings. On April 12, 1974, S. K. and his mother appeared with counsel before Judge Scott to request permission for S. K. and his mother to move to New York State where they would live with S. K.'s grandparents. The Probation Officer present had no objection to the request. A police officer, however, pointed out that S. K. allegedly had been involved in an arson incident (which had been continued without a finding). Judge

Scott remarked that arsonists should be locked up and never set free. She then inquired of S. K.'s mother how much time she spent with S. K. The mother replied that she had to work to support her family since she and S. K.'s father were divorced. Judge Scott told S. K.'s mother that a woman's first responsibility was to the home, that S. K. had lacked appropriate supervision and had been neglected. S. K.'s mother told Judge Scott that she had to work to support her family and that she loved S. K. Judge Scott stated that she would not decide the matter that day (it was Good Friday) and continued the matter until the following Tuesday. She announced, however, that she would commit S. K. to Roslindale Detention Center because she did not trust S. K.'s mother to bring him to court. (At this time S. K. was living in a foster home a few doors from his mother, who had requested foster care because she felt S. K. needed male supervision.) S. K.'s lawyer protested that S. K. had not been found guilty of anything and that S. K. should not be incarcerated. Judge Scott then said, first to the Clerk, then to the Probation Officer and next to the police officer, "Who will take this boy?" S. K.'s mother replied, "I will take my child." Judge Scott retorted: "Well, you are not going to have him." Finally, S. K.'s attorney persuaded Judge Scott to release S. K. to him and said he would assure S. K.'s future appearance. The following Tuesday, another judge allowed the request to permit S. K. and his mother to move to New York.

2.  D. C., a juvenile, was arraigned at the Dorchester District Court on March 22, 1976 and was charged with assault and battery by means of a dangerous weapon. D. C. had been represented in the past by Ms. A. of the Juvenile Court Advocacy Program of the Greater Boston Legal Services. Ms. A. was unable to attend the arraignment and another attorney was appointed to represent D. C. at the arraignment. Prior to the transfer hearing on April 13, 1976 Ms. A. gathered background information concerning the defendant and notified D. C.'s court-appointed counsel that she would represent D. C. On April 13, 1976 Ms. A. appeared before Judge Scott on behalf of D. C. Judge Scott asked who had bailed out D. C. (who had originally been held on $75 cash bail). When advised that a neighbor had provided the cash, Judge Scott observed that if a neighbor had bailed him out, a neighbor could pay for a lawyer. Ms. A. pointed out that indigency was not an issue since she was not court-appointed. Upon discovering that a lawyer had been appointed previously, Judge Scott ordered Ms. A. to withdraw her appearance. Judge Scott stated that "Legal Services was a good idea at first, but now you people do nothing but cause trouble" and that Ms. A.'s agency was "an intermeddler". When the original court-appointed attorney was brought in, Judge Scott ordered Ms. A. from the courtroom, and she indicated that D. C.'s counsellor and social worker must leave as well. Judge Scott refused to permit Ms. A. to speak to D. C. D. C. was bound over to the grand jury for an adult indictment.

3.  On September 11, 1973, in the juvenile session of Dorchester District Court the defendant was charged with using loud and abusive language in a public way. The defendant was in the company of two co-defendants who were arrested for speeding. The arresting officer testified that he heard no loud and abusive language

at the time of the arrest, although one boy, he was not sure which one, did talk back to him. Defense counsel moved for a directed verdict. This motion was denied by Judge Scott, who invoked a non-existent "misdemeanor law" that anyone at the scene of a misdemeanor could be charged with the offense without further evidence. The defendant was found guilty.

4.  A twelve year old boy, J. R., with no prior delinquency record, and his brother were charged with intent to rob and assault to rob and were brought before Judge Scott in the Juvenile Session of Dorchester District Court on September 11, 1973. When the victims, two young girls, testified, they identified J. R.'s brother as an assailant. Pointing to J. R., defense counsel asked the victims, "Did you see this boy?" One victim said "No", and the other victim said "No, I'm not sure." Defense counsel moved for a directed verdict of not guilty for J. R., which was denied by Judge Scott who said that the defendant was before the court "for some reason". J. R. was judged delinquent.

5.  R. B. was charged with assault and battery on July 1, 1975. After several continuances, the matter came on for hearing before Judge Scott on December 18, 1975 in the Barnstable District Court. The complaining witness failed to appear and Judge Scott dismissed the complaint on the condition that R. B. pay $50 costs. On October 18, 1976, the assessment of costs was vacated by the Superior Court.

6.  On November 19, 1973 defendant appeared before Judge Scott in the Dorchester District Court pursuant to a probation surrender notice and a charge of receiving stolen goods. He was on probation on a charge of disorderly conduct. Defense counsel moved to suppress evidence on the receiving stolen goods charge. The motion had been filed but had not yet been signed by the defendant. Judge Scott denied the motion indicating that she was doing so because it had not been timely signed; thereafter, the government asked for a continuance of the receiving stolen goods hearing which Judge Scott readily granted.

Defense counsel next requested permission to record the probation surrender under District Court Rule 46. Judge Scott stated there was no right to record surrender hearings and, further, that the district attorney had not received proper notice. Defense counsel stated that it was the practice at the Dorchester District Court to permit attorneys to record proceedings without prior notice. District Court Rule 46 stated:

> "A party to a civil or criminal case shall be permitted to record by electronic means any oral proceeding relating thereto which takes place in court, provided that, except in the case of arraignments, said party shall have notified all opposing parties, in writing, of his intention to record the proceeding at least forty-eight hours in advance of the proceeding. The recording of such proceedings by persons other than parties shall be allowed only in the discretion of the court."

Judge Scott denied the motion to record. Defense counsel next asked for a preliminary hearing on whether the defendant should

be surrendered pursuant to *Gagnon* v. *Scarpelli,* 411 U.S. 778, 786 (1973), which Judge Scott denied. Judge Scott presided over the probation surrender hearing.

7. On December 3, 1973 defendant was before Judge Scott in the Dorchester District Court for violation of probation, which was imposed when the defendant was found guilty of getting a woman, not his wife, with child under G. L. c. 273, § 12. As a condition of probation, the defendant was required to pay support. On November 26, 1973 defendant had appeared before another District Court judge who notified the defendant of the probation officer's intent to seek a surrender, without affording him an opportunity for a hearing. At the hearing before her, Judge Scott failed to conduct a preliminary probation revocation hearing required by *Gagnon* v. *Scarpelli,* 411 U.S. 778, 786 (1973). Defendant had never waived his right to a preliminary hearing. Although the District Court had not yet issued its new guidelines for implementing *Gagnon* v. *Scarpelli,* in Bulletin No. 10-73, dated November 15, 1973, Chief Justice Franklin N. Flaschner discussed the changes mandated by *Gagnon* v. *Scarpelli* and concluded: "In order not to · be deluged by exercises in futility we will have to employ the technique of waiver of the preliminary hearing, but this will have to be done with great care and generally only when the probationer is represented by counsel. The Committee on Probation is presently drawing up guidelines for the various situations which give rise to revocation hearings. A revision of the notice of surrender for violation of probation will have to encompass the probationer's right to the preliminary as well as to the final revocation hearing. Moreover, a form of waiver of the preliminary hearing will have to be adopted. In the meantime, you are urged to read this case and adapt its requirements to your present practice as best you can until these new guidelines and forms are promulgated." Judge Scott made no finding of the defendant's ability to pay support, required as a condition of probation, but revoked the suspension of his sentence and ordered that he serve a one year sentence.

8. The defendant, age fifteen, had run away from home on or about October 28, 1975. His mother petitioned the Dorchester District Court pursuant to G. L. c. 119, §§ 39E-39J, alleging that the defendant was a child in need of services. On October 31, 1975, he returned home voluntarily. He had never run away before, and did not run away after, this incident. On November 17, 1975, the defendant appeared at the juvenile session, accompanied by his mother, who informed Judge Scott that the defendant had returned home voluntarily and that she had had no further trouble with him. The defendant did not have counsel, and Judge Scott did not advise him of his right to counsel. The defendant's mother and a probation officer recommended that the defendant continue to live at home. Judge Scott imposed bail in the amount of $2,500 surety bond. He was taken from the courtroom in custody and transported to the Juvenile Detention Center in Roslindale. On November 18, 1975, he was released to his mother's custody on $2,500 personal surety that day.

9. The defendant, seventeen years old, was arrested on November 23, 1973 for armed robbery. Bail was set at $3,000 at the police

station but reduced to $1,500 by a bail commissioner. The defendant's mother provided $95 to a professional bondsman to secure her son's release. On November 24, 1973, the defendant appeared before Judge Scott for arraignment in the Dorchester District Court. The defendant's mother was also present but the defendant did not have counsel. Judge Scott did not appoint counsel on the grounds that since the defendant had posted bail, he was not indigent. In fact, the defendant was a student and his mother was on welfare. Thereupon, Judge Scott raised the bail to $5,000 and the defendant was taken to Charles Street Jail. On November 28, 1973, the defendant was released from jail following a successful bail appeal by the Charles Street Jail Bail Project.

10.  V. G., a juvenile, was charged on March 20, 1973, with violation of Massachusetts Controlled Substances Act, and he was arraigned before Judge King in the Dorchester District Court. The Massachusetts Defenders Committee was appointed to represent V. G. but later withdrew on the grounds of conflict of interest. V. G. was advised that he should seek other counsel. V. G. retained the services of Mr. D. of Boston Legal Assistance Project (hereinafter "B.L.A.P."). Mr. D. was unable to appear on the trial date (April 10, 1973) and having advised the arresting officer and the police prosecutor of this fact, asked Mr. S., his associate, to move for a continuance. When Mr. S. appeared, Judge Scott said: "Who is the attorney for Mr. G.? Oh, I see, Mr. D., Boston Legal Assistant Project. That explains a lot. Motion denied. You people from Boston Legal Assistance Project want it both ways. You don't think of the Court or the Judge having any standing," and ordered Mr. D. off the case on the grounds that V. G.'s father did not qualify for legal assistance. Judge Scott ordered Mr. S. to file an appearance for bail purposes. Although V. G. had been released in his father's custody, Judge Scott raised bail from $2,-000 to $5,000 with surety. Bail was reduced to $2,000 the next day by the Superior Court.

On April 24, 1973, Mr. D. appeared with the defendant for trial. Judge Scott informed D. that a B.L.A.P. lawyer could appear only by appointment of the court. Judge Scott said: "You people from Boston Legal Aid (sic) or whatever you call yourselves are meddlers in the business of this Court" and ordered Mr. D. to leave the courtroom. Previously, the defendant had told Judge Scott that he wanted Mr. D. to represent him and that he did not want to go forward with the attorney retained by his father at Judge Scott's insistence. Thereafter, the Superior Court vacated Judge Scott's finding on the juvenile complaint on the grounds that he had been denied effective assistance of counsel.

11.  The defendant appeared before Judge Scott in Dorchester District Court on February 27, 1973 on a juvenile complaint charging possession of hashish with intent to sell. The defendant had been previously released in the custody of his mother. At the conclusion of the hearing Judge Scott informed counsel that she was going to dismiss the juvenile complaint and issue an adult complaint. Defense counsel requested a continuance to prepare for a hearing on whether an adult complaint should be issued. Judge Scott responded that she would grant the request for a continuance but would hold the defendant (a juvenile with no prior record

who lived with his family in Dorchester) on $10,000 bail with surety. Therefore, counsel waived his request for a hearing on the issuance of the adult complaint and agreed to go forward on a probable cause hearing on the adult complaint that day. At the probable cause hearing, Judge Scott bound the defendant over to the grand jury at a bail of $7,500 with surety. As a result of Judge Scott's imposition of bail, the defendant spent three days in jail before being released on his own recognizance on a bail appeal.

12. On April 10, 1973, the defendant was tried on a charge of being delinquent by means of armed robbery. The presiding judge stated that he would continue the case without a finding if the weapon were surrendered by April 17, 1973. The defendant was released on $1,000 personal recognizance. On April 17, the case came before Judge Scott for disposition in Dorchester District Court. The court papers before Judge Scott indicated only that the defendant had been before another judge of that court on April 10, 1973 and that the matter had been continued to April 17, 1973. Judge Scott informed the defendant that she was going to hold a trial. The defendant's counsel objected on the basis that defendant had already been tried on the merits and asked for a two week continuance to bring back witnesses. His request was denied. Judge Scott then took testimony from the prosecution's witnesses and ordered that the juvenile complaint be dismissed and that an adult complaint issue. After finding probable cause, Judge Scott inquired about bail. The Probation Officer said it was the defendant's first offense, that he had always appeared for court and that the Probation Office recommended that bail remain at $1,000 personal recognizance. Judge Scott set bail at $10,000 with surety.

13. Mrs. R. was charged in the Barnstable District Court with three separate incidents of contributing to the delinquency of a minor. On June 24, 1976 Judge Scott allowed a motion by defendant's counsel to withdraw his appearance. On July 5, 1976 said counsel asked Ms. N. if she would represent the defendant and advised her that the case was on trial on July 8, 1976. Ms. N. agreed to represent the defendant but was unable to meet with the defendant before the date set for trial. Following what she understood to be the practice in the Barnstable District Court, Ms. N. notified the Police Department on the day before the trial that she had been unable to meet with the defendant and would request a continuance on July 8 on the grounds that she would not be ready for trial. On July 8, Ms. N. appeared before Judge Scott at 11:00 A.M. and moved for a continuance. Ms. N. stated that she had been unable to meet with the client before the trial date, that she had advised the police in advance that she would request a continuance so that they need not subpoena witnesses, that she had made a quick review of the police reports and believed that she should file a motion to suppress certain evidence and that she wished to have an opportunity to interview witnesses. The police objected to the continuance and Judge Scott ordered the matter to trial at 2 o'clock that afternoon. When the case was called at 2 o'clock, Ms. N. renewed her request for a continuance and stated to the court that she was not prepared for trial. Judge Scott denied the motion and ordered that the case be tried. The police put on all their witnesses and Ms. N. decided not to put the defendant on the

stand. The defendant was found guilty on all three charges. Judge Scott stated that she would commit the defendant to the Taunton State Hospital for 40 days of observation prior to sentencing. When Ms. N. stated that she was going to appeal, Judge Scott committed the defendant to the House of Correction. The defendant was released from the House of Correction the following day by the Superior Court.

14. Mr. B. was convicted on July 23, 1974 in the Brighton District Court of larceny, was placed on probation, and was required as a condition of probation to make restitution of $1,190.80. Thereafter, he failed to make restitution and was told to appear at a hearing concerning his alleged violation of the conditions of probation. A warrant was issued for his failure to appear at said probation violation hearing and, on March 9, 1978, he was brought before Judge Scott in the Brighton District Court. Mr. B. did not have counsel present, was not advised that he had a right to counsel and that the court would appoint counsel if he were indigent, and did not receive a probation violation hearing. Judge Scott asked the defendant if he had made any payments towards restitution. He responded that he had paid $90. Judge Scott stated that she would give him credit for $90 against an order for restitution in the amount of $1,190.80 and stated further that she was committing him to the Charles Street Jail where he would either pay $1,100.80 or work the restitution off at the rate of $3 per day. Thereupon Judge Scott committed the defendant to the Charles Street Jail pursuant to a mittimus which stated that the defendant was committed to jail for failure to pay restitution in the amount of $1,100.80 which would be worked off at the rate of $3 per day. The defendant remained incarcerated under that order until March 22, 1978 when Judge Artesani issued a writ of habeas corpus and vacated Judge Scott's order.

15. On March 21, 1972, R. P. was waiting for a friend outside the Juvenile Session of the First District Court of Barnstable County. Judge Scott was presiding over a trial inside the courtroom. One of the attorneys informed Judge Scott that "someone" was looking into the courtroom through a window in the door to the courtroom, and was upsetting his client on the stand. A court officer, at Judge Scott's direction, had previously told everyone in the corridor outside the courtroom to move away from the door. Judge Scott directed that the person looking through the window be brought before her. R. P. and another person were brought before Judge Scott. After asking R. P. his name and address, Judge Scott found him in contempt of court and fined him $200. She ordered him to pay the fine forthwith or go to jail. R. P. had no funds and was taken to Barnstable House of Correction.

16. Mr. M. was charged with operating a motor vehicle without a license and operating after the suspension of a license. He had been charged on January 8, 1976. On February 26, 1976, he appeared in Barnstable District Court before Judge Scott and asked if he was ready for trial. He replied that he did not have an attorney and had just applied for a public defender. Judge Scott told him that he was in contempt of court for failing to be ready. He said he thought he was supposed to apply for a public defender on that date and he did not know he was supposed to be ready for

trial. He was assessed $100 costs, "to be paid forthwith," placed in the dock, and ordered to serve 30 days in jail in the event he could not pay the $100. Thereafter, the defendant was found indigent and an attorney was appointed to represent the defendant. The attorney asked the court if, in view of the defendant's indigence, the defendant might have time to pay the fine. Judge Scott denied this request and committed the defendant to jail.

17. Mr. C. was charged with breaking and entering and had been released on personal recognizance. After he failed to appear at a hearing on January 14, 1975, on March 29, 1975, a Saturday, he was brought before Judge Scott in Barnstable District Court on a default warrant. He did not have counsel. The probation officer and the arresting officer knew the defendant and vouched for the defendant's later appearance. Judge Scott found the defendant in contempt and sentenced him to twenty-seven days in the House of Correction. The defendant did not receive a hearing; nor was he afforded counsel. He served several days in jail before appointed counsel secured his release.

18. Mr. K., twenty years old, was charged with breaking and entering in the night. When his case was reached for trial in Barnstable District Court on April 1, 1976, K. told Judge Scott that his attorney, who was from Stoneham, had had car trouble and would be late. The case was held for second call. When the case was called again, K.'s attorney had not yet arrived although K. had been present all day. Judge Scott assessed K. $50.00 costs, to be paid forthwith, for failure to be ready. K. said he had no funds and asked if [he]might pay the $50.00 the following week on the date to which his case was continued. He pointed out to the court that he had appeared that day and that he would appear in the future. Judge Scott denied K.'s request. She stated that she did not know where K. lived and emphasized that the complaint did not list a home address for K. K. repeatedly represented that he lived with his parents at a particular local address. Judge Scott ordered that K. be held in custody until he paid the costs or until his parents paid the costs for him. When he was being taken to the dock, K. repeated his address and added (to Judge Scott) "if you can get it through your head." Judge Scott immediately adjudged him in contempt of court and ordered him jailed for 30 days.

19. Mr. F. was charged with larceny by check ($59.95) and was ordered to appear at the Barnstable District Court. He was not properly served with a summons, although he did receive notice that he was to appear in court. He failed to appear and was arrested on a warrant. He appeared before Judge Scott in the afternoon of April 12, 1974, the day of his arrest. Judge Scott appointed counsel to represent F. F. did not know he was being charged with contempt or that he was to be tried for contempt. Thereafter Judge Scott found F. in contempt of court "for failure to respond to summons" and sentenced him to the House of Correction for 10 days.

20. A proceeding was conducted before Judge Scott in Dorchester District Court on December 11, 1973 in which several juveniles were charged with being delinquent by reason of murder. The murder had taken place on October 4, 1973. H. F., a juvenile of sixteen years of age who was not a defendant, was called to testify.

The Commonwealth asked the witness, "Directing your attention to October 4, 1973, did you stay in your apartment all day?" The apartment was a short distance from the place of the murder and H. F. had been placed near the scene of the murder by another witness. Upon advice of counsel, H. F. refused to answer this and two other similar questions on grounds of the Fifth and Fourteenth Amendment privilege against self-incrimination. Judge Scott did not order H. F. to answer the questions. After a brief argument during which counsel cited authority to Judge Scott in support of his view that the privilege was well-taken, Judge Scott held the witness in contempt and sentenced him forthwith for 60 days to the Department of Youth Services. At the Commonwealth's request, Judge Scott ordered that the clerk write on the contempt finding that there would be no furlough and no parole. Judge Scott thereafter caused the issuance of a juvenile complaint and summarily adjudged the petitioner delinquent by reason of his refusal to respond to the inquiry. The Superior Court later ruled in vacating Judge Scott's order that "[t]he use of the juvenile complaint and the summary adjudication of the petitioner thereunder was merely the method selected by the Dorchester District Judge to implement her contempt rulings." The Supreme Judicial Court held that the witness was denied his constitutional rights. *Taylor* v. *Commonwealth*, [369 Mass. 183 (1975)]. The Commonwealth fully supported Judge Scott's actions on appeal.

21. A twelve year old juvenile appeared before a judge other than Judge Scott in Dorchester District Court on November 17, 1972 on complaints charging possession of marijuana and larceny from a person. The judge announced that she would release the defendant on personal recognizance but the defendant decided he did not want to go home. Therefore, the judge sent him to Youth Services Board on $1,000 bail. On December 29, 1972, the judge removed the bail because the defendant decided to go home, and the defendant was placed on personal recognizance. On January 2, 1973, Judge Scott placed the defendant on $3,000 bail on the larceny complaint citing the following reasons: "Victim (74 year old woman) is confined to her bed and cannot appear in court. Prior offense—possession of a controlled substance." Judge Scott also checked off the "nature of the offense" and wrote "larceny from person." On January 3, 1973, the Superior Court reviewed the bail and placed the defendant on personal recognizance.

22. Defendant was brought before Judge Scott in Dorchester District Court on February 4, 1972 on an assault and battery complaint brought by his wife several months before. The defendant, who claimed that he was unaware of the complaint, had been arrested on a warrant dated 10/15/71 when police officers checked his record after he had visited his brothers who were in the Charles Street Jail.

The defendant's wife told Judge Scott that she did not wish to press the complaint, but Judge Scott said that the court did not want to dismiss the complaint. The defendant had no criminal record and no prior defaults and he claimed that he had never received notice of his wife's complaint against him. Judge Scott held the defendant on $2,000 cash bail only, stating that the defendant was before the court on a "default warrant since 10/15/

71." As a result, the defendant spent 4 days in jail before being released on bail appeal. Judge Scott at no time advised the defendant of his right to have an attorney and he did not have an attorney until his bail appeal was heard. The complaint was dismissed upon request of the defendant's wife and consent of the defendant.

23. On April 24, 1973 the defendant, a nine year old girl, who was charged with assault to rape a female child under sixteen, appeared before Judge Scott in Dorchester District Court. Her brother, an eleven year old boy, was charged with the same crime. The Probation Department recommended that the girl be allowed to be released in the custody of her mother and the Probation officer asked to be allowed to take the girl home. The defendant lived with her mother who lived with her sister-in-law at Columbia Point. The defendant had no prior record. Judge Scott set bail in the amount of $5,000, citing as reasons the "seriousness of the crime," an assault on the victim since this offense was complained of, and the fact that the victim's mother "begs the court to detain juvenile defendant." Judge Scott also directed the victim's mother to be present at any bail review. On the same date, a Superior Court judge allowed a bail petition and released the defendant on personal recognizance.

24. The defendant was charged with breaking and entering in the daytime and stealing $7.00 worth of silver. When he was arraigned, Judge Shulman released the defendant on $500 bail, of which the defendant paid 5% as part of the Percentage Deposit Bail Project. On May 30, 1972, the defendant appeared before Judge Scott in Dorchester District Court and was found guilty. He appealed and Judge Scott increased his bail to $5,000. Defense counsel objected, stating that the defendant has shown up for his trial and there was no reason to assume that he would not show up for a Superior Court trial. In stating the reasons for the bail, Judge Scott noted the defendant's record, that he had many defaults and the "Court has reason to believe he will abscond because of nature of prior crimes—drugs involved." On May 31, 1972, the Superior Court reinstated the original bail.

25. The defendant appeared before Judge Scott on December 31, 1973 in Dorchester District Court on a charge of violating the narcotic laws. He was found guilty. He had been on bail in the amount of $3,500 and when he appealed, she increased the bail to $5,000. Judge Scott checked off all seven of the reasons provided in the District Court form for setting bail, stating that the defendant was a parolee, that he had a long record, and that the parole officer had said he was going to revoke the defendant's parole. Although Judge Scott checked off the item that the defendant had a record of flight to avoid prosecution and the box concerning defaults, he had no such record and did not have any defaults. Furthermore, she checked off the box indicating that the defendant lacked substantial roots in the community when, in fact, he lived in Dorchester all his life.

26. The defendant, a twelve year old, was charged with pickpocketing a purse in a supermarket. At a hearing before Judge Scott on December 7, 1973 in the Dorchester District Court, sufficient facts were found and a hearing was held on disposition. Defense coun-

sel, a representative of the Massachusetts Defenders Committee, advised the Court that the defendant was presently committed to the Department of Youth Services. The Department had agreed to place the defendant in a supervisory program permitting the defendant to attend public school and return to the supervisory program in the evening. The defendant had received the same disposition from the Boston Juvenile Court for a similar incident a week earlier.

Judge Scott stated that the Massachusetts Defenders Committee's attorneys cared little about their clients' real needs and that this particular defense counsel was too inexperienced to know what was in the defendant's best interest. She also said that the Department of Youth Services was highly responsible for the amount of juvenile crime and noted its failure to rehabilitate boys like the defendant. The Department of Youth Services representative present, when asked for his opinion, agreed that the defendant should be institutionalized. Judge Scott committed the defendant to the Department of Youth Services. When defense counsel said that the defendant would appeal, Judge Scott announced, "All right, then, maybe we should treat him as an adult." When defense counsel noted that the defendant was only 12 years old, Judge Scott stated, "Well, I am going to set bail on him." Judge Scott had previously set bail at $2,500. Defense counsel pointed out that bail had already been set and been made, that there were no changed circumstances to justify a higher bail, that the defendant had never defaulted and had always shown up for every court appearance, and that the defendant lived at home with his mother who was careful to insure that he appeared in court. The defendant's mother was in court at the time. Thereupon Judge Scott entered into a dialogue with the defendant's mother during which she criticized the mother for failing to care properly for her child. At this point the defendant's mother stated that she loved the defendant very much and had always cared for him but that his problems stemmed from her relationship with her husband who did not like the defendant and who threatened him. Faced with the choice of her husband or her son, the defendant's mother said that she had separated from her husband. She felt that her home situation was much better. At this point, Judge Scott noted that if there were threats involved she had to protect the defendant by not allowing him to go home. Judge Scott set bail at $3,500 (an increase of $1,000) and wrote as one of the grounds that the defendant had been threatened by his step-father. She also specified "Boy has been on *nine* similar charges in the past year and has been committed to DYS on three of these charges—is again before court for larceny from elderly woman—handbag—court can't guaranty appearance." The defendant was committed to Roslindale Detention Center. The Superior Court denied the petition for review of bail.

27.  The defendant appeared before Judge Scott on December 18, 1973 in Dorchester District Court on a charge of unarmed robbery. The case was continued on whether an adult complaint should issue and Judge Scott increased defendant's bail to $5,000 with surety. The defendant had previously been released by Judge Tucker on personal recognizance. In a written statement of reasons for in-

creasing bail, Judge Scott noted that the victims "felt that it is time something be done about this", that the Commonwealth requests bail, that there was positive identification of the juvenile, that the defendant had previously been convicted of unarmed robbery and "that an adult complaint will issue." The defendant was sixteen years old, lived at home, was a student in the eleventh grade at Boston High School, had never defaulted in a court appearance, and had been working a few days a week at Filene's prior to his appearance on December 18, 1973. The defendant spent six days in jail before he was brought back to court for a hearing on the dismissal of the juvenile complaints. At that hearing the police prosecutor said that he had no objection to the defendant being released on personal recognizance. Judge Scott continued the bail. He was later released on a bail appeal in the Supreme Judicial Court after spending a total of ten days in jail. On January 15, 1974 Judge Scott denied the defendant's request that she disqualify herself from presiding at the Rule 85A hearing on whether an adult complaint should issue on the grounds that she had previously stated orally and in writing that "an adult complaint will issue". After a hearing, she then ordered that the adult complaint issue.

28. Mr. R. had represented a defendant before Judge Scott in the Dorchester District Court a week prior to the incident in question. On August 13, 1973, Mr. R. was in Judge Scott's courtroom and she called him to the bench. She reprimanded Mr. R. for going behind her back to another judge to complain about the treatment he had received from her the previous week. She accused Mr. R. of "not being man enough" to come up to her himself. When Mr. R. protested that he did not know what she was talking about, and that perhaps one of his superiors might have gone to the other judge, Judge Scott accused him of not being man enough to do it himself. She told Mr. R., a member of the Massachusetts Defenders Committee, that the Committee had had a nice group of people once "but the group that was there now was a bunch of Gestapo" and that as a young lawyer he should be careful about getting mixed up with that kind of people.

29. The defendant appeared before Judge Scott on June 28, 1973 in the Barnstable District Court on a summary process matter. Her counsel advised the court that a complaint had been filed with the Massachusetts Commission Against Discrimination ("MCAD") charging that the summary process was the result of a discrimination in the rental of residential property on the ground that the defendant had children. Defense counsel requested a two-week continuance until the MCAD completed its investigation. Judge Scott granted the continuance over the objection of plaintiff's counsel. At this point Judge Scott observed in open court in full hearing of all parties that Legal Services (with which defense counsel was associated) was causing a great deal of trouble, not only in Massachusetts but throughout the country, and that she hoped the national government could eliminate legal services. Upon asking the defense counsel whether he had suggested to his client that she might file a MCAD complaint, Judge Scott stated that one of the things wrong with legal services was that it put so many ideas into people's heads. She said that people like legal

services lawyers and their clients were doing things to harm the United States of America and to tear down what hard working tax-paying persons like herself and the plaintiff were trying to build up. At the end of her remarks, Judge Scott observed that she meant none of them to apply personally to defense counsel. Counsel said he did not take her remarks personally.

## CHARGE V

1. Judge Scott acquired a Massachusetts Individual Insurance Broker's License in 1959.
2. Judge Scott continued to broker insurance until her appointment as a part time Special Justice to the Dorchester District Court in January of 1968 at which time she turned over her accounts to the Anderson-Driscoll Insurance Agency. Since that time, Judge Scott has not solicited or accepted any new insurance business from the general public. Judge Scott has continued to render assistance and advice in the renewal of her accounts for relatives, friends and her family's business (Whitehead Realty, Inc.) from 1959 to July 19, 1978. Judge Scott had continued to renew her insurance broker's license during that time. Judge Scott maintained her business address and telephone number as an insurance broker in the 1977 and 1978 Yellow Pages directory and carried her name at said business address on a business directory at 280 Washington Street, Brighton, Massachusetts, as *Scott, Honorable Margaret Capobianco* until early 1978.
3. Judge Scott has received a portion of the commissions due upon the renewal of insurance policies for her accounts until July 19, 1978. Anderson-Driscoll Insurance Agency received the balance of the commissions due.
4. On May 1, 1976, Judge Scott was sworn in as a full time Special Justice. On April 11, 1977, Judge Scott conferred by telephone with John A. Fiske, Executive Secretary of the Supreme Judicial Court, concerning whether she should report certain income in her Report of Extra-Judicial Income. At this time, Judge Scott disclosed that she had received $362.20 in commissions from the renewal of insurance policies she had previously written and represented that she did not render any services during the year to earn this income. As a result of this conversation, Mr. Fiske spoke with Chief Justice Hennessey and on April 12, 1977, Mr. Fiske called Judge Scott back. Mr. Fiske suggested that she write a letter explaining the nature of the income received and that, if her representation was true, she would not be required to report this compensation.
5. On April 12, 1977, Judge Scott sent Mr. Fiske a letter disclosing the amount of commissions received, the source of those commissions and stating that she "did not perform any service in obtaining those commissions." Judge Scott further requested information as to the status of her insurance broker's license.
6. On April 14, 1977, Judge Scott filed her Report of Extra-Judicial Income for the year ending December 31, 1976, stating that she received no income for the performance of extra-judicial services.
7. On November 22, 1977, Judge Scott filed a Massachusetts Individual Insurance Broker's Application, which she signed under the pains and penalties of perjury, requesting renewal for 1978 of

her insurance broker's license. The application listed her business address at 280 Washington Street, Brighton. In response to the question contained in this application "How much time do you intend to devote (new) or have you devoted (renewal) to your insurance business?", Justice Scott replied "15% of time per year". Attached to this application was a letter indicating that Judge Scott was a full time Special Justice, was "servicing renewal business only", and was not soliciting any new insurance accounts.

8.  Judge Scott could not reasonably be considered to have devoted 15% of her time to the insurance business. The Massachusetts Division of Insurance will not renew an insurance broker's license for any individual who does not devote at least 10% of his time to the insurance business. There is no evidence that Judge Scott was aware of this policy in November, 1977. Judge Scott did not exercise sufficient care in determining and reporting accurately the amount of the time she had devoted to her insurance business or in determining the significance of the question concerning the amount of time she had devoted to the insurance business.

9.  On April 14, 1978, Judge Scott filed her Report of Extra-Judicial Income for the year ending December 31, 1977, stating that she "did not engage in extra-judicial services" for which she received income. Judge Scott indicated that she held a Massachusetts Individual Broker's license and had received $390.43 in commissions on the renewal of certain insurance but that she "did not actively engage in, pursue, or solicit any insurance business whatsoever." It was further indicated that the commissions were a commission received by Anderson-Driscoll Insurance Agency who brokered the particular insurance involved.

10. On July 19, 1978, Judge Scott terminated her insurance broker's license and removed all business directory listings carrying her name.

## CHARGE VI

1.  Judge Scott has continuously held a real estate broker's license, Registration No. 435, which she last renewed on or about May 2, 1977.

2.  The form which Judge Scott executed on May 2, 1977 for renewal of her real estate broker's license listed her business address as 280 Washington Street, Brighton, Massachusetts, at which a business directory listed her in the offices of Whitehead Realty Corporation as *Scott, Honorable Margaret Capobianco.*

3.  The 1978 edition of the Boston Telephone Directory, White Pages, listed Judge Scott as "*Scott, Margaret Capobianco, Attorney*" with a business address at 280 Washington Street, Brighton and a business telephone number of 787-0007.

4.  There is no evidence that, subsequent to her becoming a full-time justice, she personally caused the entries to be made in the Boston Telephone Directory, White Pages, and the business directory at 280 Washington Street, Brighton, Massachusetts.

5.  Since her appointment as a part-time Special Justice in 1968, Judge Scott has not solicited or engaged in, the business of brokering real estate or the practice of law.

## CHARGE VII

1. On August 21, 1977, the Articles of Organization for Rosina Realty, Inc., were filed with the Secretary of the Commonwealth pursuant to G. L. c. 156B. Judge Scott was named president, treasurer and a director of the corporation with offices at 280 Washington Street, Brighton, Massachusetts 02135.

2. On September 1, 1977, the Articles of Organization for J.C. Realty, Inc., were filed with the Secretary of the Commonwealth pursuant to G. L. c. 156B naming Judge Scott as president, treasurer, and a director of the corporation with offices at 280 Washington Street, Brighton, Massachusetts 02135.

3. The assets of Rosina Realty, Inc., and J.C. Realty, Inc., consist entirely of assets previously owned and controlled by the estate of John Capobianco d/b/a Whitehead Realty Corporation of which the Judge was executrix. Whitehead Realty Corporation's business was principally the ownership and management of commercial real estate. John Capobianco was Justice Scott's father. Rosina Realty, Inc., and J.C. Realty, Inc., were established upon the advice of Judge Scott's accountant to maximize the value of assets previously held in trust under the provisions of the will of the late John Capobianco.

4. On April 14, 1978, Judge Scott certified in the "Public Report of Extra Judicial Income for the Year Ending December 31, 1977", required by Canon 6 of the Code of Judicial Conduct, as follows:

> ". . . President/Treasurer of Rosina Realty, Inc., a Mass. Real Estate Corporation, owned 100% by Rosina Capobianco (my mother) who is presently doing business as Whitehead Realty . . ."

> ". . . President/Treasurer of J.C. Realty, Inc., a Mass. corporation owned 100% by John Capobianco Trust of which I am co-trustee . . ."

In that same document Judge Scott failed to certify that she was also a director in each of the above-named corporations.

5. Although Judge Scott did not actively participate in the management of either corporation, which activities were performed by her husband, she executed as President all drafts on the corporations' bank accounts which were used in the operations of the businesses of the corporations.

6. On or about July 6, 1978, Judge Scott resigned as officer and director of both Rosina Realty, Inc., and J.C. Realty, Inc.

> The Committee on Judicial Responsibility
> Michael B. Keating, Special Counsel
> Margaret C. Scott
> Thomas C. Troy
> Jerry Effren