IN THE MATTER OF ELWOOD S. McKENNEY.

Suffolk. March 9, 1981. — July 21, 1981.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, ABRAMS, & LYNCH, JJ.

*Judge. Attorney at Law. Commission on Judicial Conduct. Board of Bar Overseers.*

Retirement of a judge accused of misconduct in his judicial office did not terminate this court's authority or responsibility to consider imposition of further sanctions relative to his continuing status as a member of the bar, including sanctions more severe than those recommended by the Commission on Judicial Conduct. [85-86]

With respect to a judge charged with misconduct in his judicial office who, as part of a negotiated resolution of proceedings before the Commission on Judicial Conduct, retired from judicial office and acquiesced in this court's imposition of public censure, this court concluded, in view of the entire record, that protection of the public did not require his disbarment or suspension from the office of attorney at law. [86-89]

PROCEEDING in relation to an inquiry concerning a judge, commenced in the Supreme Judicial Court for the county of Suffolk on June 4, 1980.

Following entry of its order of December 12, 1980, the full court considered the recommendation of the Board of Bar Overseers concerning discipline of the respondent.

*J. Albert Johnson* for the respondent.

*Daniel Klubock,* Bar Counsel.

BY THE COURT. On December 12, 1980, this court issued an order publicly censuring Mr. Elwood S. McKenney, formerly the First Justice of the Roxbury Division of the District Court Department of the Trial Court (Roxbury District Court), for his judicial misconduct. The court, regarding proceedings before the Commission on Judicial Conduct (commission), established pursuant to G. L. c. 211C, § 1,

as terminated, requested the Board of Bar Overseers (board), established pursuant to S.J.C. Rule 4:01, § 5, as amended, 368 Mass. 900 (1975), "to present its views on the matter of discipline of Judge McKenney as an attorney." These orders were entered after Mr. McKenney's retirement from judicial office.

This case is now before us on the recommendation of the board that Mr. McKenney be disbarred for misconduct in which he admittedly engaged while serving in his judicial office.

The respondent, Mr. McKenney, was admitted to the Massachusetts bar in 1951. He served in full-time judicial office continuously from 1960, until his retirement from office on October 30, 1980.[1] At the time of his retirement and at all times relevant to the material in which the board's recommendation is predicated, Mr. McKenney was, by virtue of seniority, the First Justice of the Roxbury District Court. In that capacity, he was, in addition to the performance of the judicial functions attendant upon the office of a justice of the District Court Department, immediately responsible for the administration of the Roxbury District Court. G. L. c. 218, § 6.

As a full-time justice of the District Court Department, Mr. McKenney was barred from the practice of law. G. L. c. 211B, § 4. S.J.C. Rule 3:09, Canon 5 (F), as appearing in 382 Mass. 818 (1981). None of the misconduct admitted in the material considered by the board related to the practice of law by Mr. McKenney.

The events leading to Mr. McKenney's retirement, to his public censure for judicial misconduct and, ultimately, to the instant proceedings relative to his status as a member of the bar, have their common genesis in a complaint filed against him on January 30, 1979, with the commission, by one of its members acting pursuant to G. L. c. 211C, § 2.

---

[1] Mr. McKenney would not have attained the constitutionally mandated retirement age of seventy years until March 5, 1988. See Part II, c. 3, art. 1. of the Massachusetts Constitution, as amended by art. 98 of the Amendments.

That complaint and a subsequently amended version of it were grounded entirely on the contents of a program broadcast by a Boston television station on January 11, 1979. Mr. McKenney's challenges to these complaints and our disposition of them are discussed at length in *McKenney v. Commission on Judicial Conduct*, 377 Mass. 790 (1979) (*McKenney I*), and *McKenney v. Commission on Judicial Conduct*, 380 Mass. 263 (1980) (*McKenney II*). There is no need to discuss those interlocutory issues here, except to emphasize that in *McKenney II*, in affirming the single justice's denial of Mr. McKenney's effort to terminate the commission's investigation, we reiterated this court's retention of its constitutional and statutory obligations of general superintendence which, notwithstanding the statutorily imposed procedural limitations on the commission's investigative powers, would allow this court to undertake directly an investigation of alleged judicial misconduct whether or not the charges are phrased in a form appropriate for consideration by the commission. "In our judgment, at least certain of the matters referred to in the [first] complaint [and repeated in somewhat different form in the amended complaint] clearly warrant serious consideration for investigation." *McKenney II, supra* at 268, quoting from *McKenney I, supra* at 803. Thus, in any event, the granting of the relief sought would not have halted the investigation of Mr. McKenney's alleged misconduct.

In the meantime, special counsel to the commission, Mr. Jerome P. Facher, previously appointed by this court at the request of the commission to investigate the allegations of the amended complaint, filed his report and recommendations with the commission on February 29, 1980. Subsequently, on April 11, 1980, the commission filed a notice of formal proceedings in accordance with Rule 11 of the Rules of the Commission on Judicial Conduct (R. C. J. C. 11). Following receipt of the respondent's answer and further discovery proceedings, we appointed, on June 14, 1980, again at the commission's request, Mr. Lawrence T. Perera, a former justice of the Probate and Family Court Depart-

ment of the Trial Court, as a hearing officer to conduct a hearing pursuant to R. C. J. C. 15 on the matters set forth in the commission's notice of formal proceedings. The hearing commenced on July 17, 1980, and continued, with some interruptions, until its suspension when there appeared to be an opportunity for a negotiated resolution between Mr. McKenney and the commission permitting termination of the proceedings before the commission and also permitting the submission of a report and recommendation to this court without further need of protracted evidentiary hearings. In fact, the respondent and the commission did enter into a negotiated resolution which required, as a condition precedent to the submission of the commission's report and recommendations, his retirement from judicial office.

On the day of Mr. McKenney's retirement from office, October 30, 1980, the commission filed its report and recommendations with this court as provided for by G. L. c. 211C, § 2, and R. C. J. C. 22. Appended to the commission's report was an "Agreed Statement of Facts" relative to the respondent's conduct in the acquisition of a Cadillac automobile and of a Volkswagen automobile, the particular matters on which the commission's recommendations were specifically grounded, and, additionally, to six other matters involving Mr. McKenney's conduct while First Justice of the Roxbury District Court. This "Agreed Statement of Facts," dated August 21, 1980, was signed by Mr. McKenney, his lawyer, and the special counsel to the commission.[2]

The commission recommended that, notwithstanding his retirement, Mr. McKenney be publicly censured for his misconduct in acquiring the Cadillac and Volkswagen automobiles, that he be permanently barred from sitting again as a Massachusetts judge and that the hearing officer be discharged without the necessity of his filing a report in accordance with R. C. J. C. 19.

---

[2] The "Agreed Statement of Facts" is attached to this opinion and marked Appendix A.

On December 12, 1980, after arguments heard on November 19, 1980, we entered our order publicly censuring Mr. McKenney for judicial misconduct. That order terminated the proceedings before the commission and, consequently, had the effect of discharging the hearing officer without the necessity of a further report in accordance with the commission's request.

We did not then respond directly to the commission's recommendation that Mr. McKenney be permanently barred from sitting again as a Massachusetts judge, and we need not respond now. Given the constitutional and statutory provisions applicable to appointment to judicial office in the first instance and, after retirement, to temporary recall to active judicial service, the alternate routes by which Mr. McKenney might theoretically return to the bench, we question the necessity and, in some respects, the propriety of entering an order barring him from future judicial service in this Commonwealth. Part II, c. 3, § 1, of the Massachusetts Constitution, as amended by art. 98 of the Amendments. G. L. c. 211B, § 14. We need not linger long on this point. It suffices that, in all the attendant circumstances, we consider Mr. McKenney's retirement to contain an implicit abjuration of future judicial service.

The commission's recommendations made no reference to Mr. McKenney's continuing status, following his retirement, as a member of the bar generally eligible to engage in the practice of law[3] although, in this respect, the commission could have recommended his suspension from the bar or even his disbarment. See R. C. J. C. 19. In any event, we are not limited by the commission's recommendations, whether made unilaterally or as a result of a negotiated resolution. Indeed, in an earlier case, we imposed a sanction more severe than that recommended by the commission's predecessor, the Committee on Judicial Responsibility, es-

---

[3] A retired judge is barred from filing an appearance in any court of the Commonwealth for a period of six months following his retirement. S.J.C. Rule 3:09, Compliance with the Code of Judicial Conduct (A) (2), as appearing in 382 Mass. 820 (1981).

tablished pursuant to S.J.C. Rule 3:17 (repealed effective January 1, 1981). *Matter of Scott,* 377 Mass. 364, 370 (1979).

Although our acceptance of the commission's report and recommendations terminated the commission's consideration of the matters then pending before it, the "Agreed Statement of Facts," appended to the commission's report and recommendations, brought to our attention specific details with respect to the two matters on which the commission's recommendations were particularly predicated and further information relative to Mr. McKenney's conduct in other areas with respect to which the commission had made no recommendation. The conclusion to be drawn from the inclusion of this additional information in the "Agreed Statement of Facts" is that it and the inferences permissibly to be drawn from it were presented for our consideration and, if deemed appropriate or necessary, for further action without any recommendation by the commission as to the nature or thrust of such possible action. Otherwise, there is no rationale for the inclusion in the "Agreed Statement of Facts" of information extraneous to the basis of the commission's specific recommendations relative to the sanction to be imposed on Mr. McKenney for his conduct in acquiring the two automobiles.

Since Mr. McKenney's retirement from office and, contingent upon that retirement, the imposition of a public censure for his misconduct in office effectively put an end to our consideration of the issue of judicial discipline, the reasonably foreseeable consequence of the filing of the "Agreed Statement of Facts," considered in its entirety, was to present this court with questions regarding Mr. McKenney's fitness to continue as a member of the bar of the Commonwealth. Therefore, despite the fact that Mr. McKenney had already been publicly censured for misconduct in office, it was appropriate, in view of the entire contents of the "Agreed Statement of Facts," to seek the board's recommendations as to his continuing status as a member of the bar. See ABA Standards Relating to Judicial Discipline and Disa-

bility Retirement 4.4 (1979). In this context, the question is whether Mr. McKenney's admitted misconduct in office was so serious, notwithstanding his retirement and censure, as to require the imposition of further sanctions on him as a member of the bar.

In response to this question, the ten members of the board who considered Mr. McKenney's conduct unanimously determined that "[b]ased on the Agreed Statement of Facts, the Board believes that grounds for disbarment exist and recommends that the Court disbar Elwood S. McKenney" (emphasis supplied).

We need not rehearse here the contents of the appended "Agreed Statement of Facts," but we recognize that the board, on the basis of the information considered by it, could reasonably have concluded that adequate grounds existed for Mr. McKenney's disbarment. In view of the limited state of the record on which the board's recommendation was made, however, our responsibility does not end at this point.

The "Agreed Statement of Facts" was prepared, during a suspension of the hearing before the hearing officer, prior to the introduction of evidence in Mr. McKenney's defense, other than the cross-examination of witnesses presented by the special counsel, and for the specific purpose of expediting proceedings before the commission in the interest of presenting a mutually acceptable recommendation to this court. As such, although arrived at through negotiation between Mr. McKenney and the commission, the "Agreed Statement of Facts" did not contain all possibly available information in mitigation of the conduct admitted by Mr. McKenney. Nor did the board purport to consider any such factors in making its recommendations.

Thus, in considering the "Agreed Statement of Facts" and basing (as it stated) its recommendations exclusively on it, the board did not have available for its consideration the full range of information that would have been available to it, in the normal course of events, as the result of the receipt and processing of a complaint of professional misconduct

according to S.J.C. Rule 4:01, § 8, as amended, 365 Mass. 696 (1974). During the course of oral arguments on the board's recommendation on March 9, 1981, it was argued that mitigating factors, such as those pertaining to the character and prior record of service of Mr. McKenney, do exist which would be relevant in adjudging any appropriate disposition of the possible discipline of him as an attorney. Accordingly, "for the further information and guidance of the court, and in the interests of a just decision," we entered an order on April 2, 1981, requesting that bar counsel and counsel for Mr. McKenney "file, as soon as feasible, a joint statement, if that be possible, or separate statements, indicating what, if any, mitigating circumstances exist that should be considered by the court."

In compliance with that order, counsel for the respondent submitted on May 14, 1981, a document entitled "Matters in Mitigation."[4]

---

[4] We summarize below some of the major mitigating facts, as contained in oral and written presentations by Mr. McKenney through his counsel.

Mr. McKenney was the recipient of a four year scholarship. He also worked as a "red cap" baggage carrier to underwrite the costs of his undergraduate education. After graduation from college with honors in 1938, he served as a page in the Massachusetts House of Representatives before enlisting in the United States Army in 1942. Mr. McKenney was released from active duty as a Captain, United States Army Reserve, with numerous citations for meritorious service and eventually, in 1961, was honorably discharged as a Major. In 1946, he became the first black person to be appointed to the Massachusetts Fair Employment Commission, the forerunner of the Massachusetts Commission Against Discrimination, G. L. c. 6, § 56. While serving on the commission, he attended law school in the evenings, graduating in 1950, and was admitted to the bar in 1951. Service on the commission was followed by service on a presidential committee to study racial desegregation in the armed forces and, in 1954, as executive director of the World Veterans Fund. Mr. McKenney joined the Governor's staff in the following year, 1955, and, in 1959, was appointed Chief Secretary to the Governor. In 1960, he was appointed a justice of the Roxbury District Court where he assisted in securing the construction of a new court house, undertook a minority recruitment plan, established a court clinic and introduced programs to address the prevalence of alcoholism and drug addiction among defendants, cooperated in the establishment of a law school defender program, and secured funding for a pretrial diversion program. Within the Roxbury community, Mr. Mc-

That document consists of two parts. The first is a memorandum prepared by Mr. McKenney's counsel and setting forth particulars with respect to his academic achievements, military service, prior State and Federal governmental experience, participation in a variety of veterans, cultural and civic affairs, particularly in the Roxbury community, and his accomplishments in the administration of the Roxbury District Court. The second part is a collection of laudatory letters from judges, court employees, lawyers, and community leaders.

Bar counsel, on behalf of the board, responded on May 20, 1981, by agreeing "that the facts, as distinct from untested opinion and argument, included in respondent's submission entitled 'Matters in Mitigation' may appropriately be considered by the Court on the issue of mitigation." The distinction drawn by the bar counsel is well-taken and, in considering the proffered "Matters in Mitigation," has been observed.

Furthermore, the document entitled "Matters in Mitigation" is accepted for and may properly be considered with respect to disposition of the board's recommendation but cannot be considered as a repudiation or retraction of the "Agreed Statement of Facts" submitted by the commission and considered by the board. The "Agreed Statement of Facts" stands in its entirety and, by his participation in its formulation, Mr. McKenney has admitted directly and by permissible inference to serious incidents of misconduct in judicial office.

In determining the appropriate sanction to be imposed upon Mr. McKenney for admitted misconduct, we now have before us an appropriately complete record. In weighing the contents of this record and, where appropriate, in

Kenney was associated with Freedom House, the Boys' Clubs of Boston, the Lawyers Committee of the National Association for the Advancement of Colored People and the Boston Legal Aid Society. He served as president of the Military Intelligence Association of New England and was active in the affairs of the Massachusetts Judges Association and the Black Judges Conference.

establishing permissible inferences to be drawn from it, we also consider Mr. McKenney's conduct subsequent to the filing of the initial and amended complaints against him.

At first, as was his right, Mr. McKenney challenged these complaints in *McKenney I* and *McKenney II*. Those proceedings having terminated adversely to him, he then pursued incompletely a defense, as authorized by the commission's rules as approved by this court (see G. L. c. 211C, § 2), in proceedings before the hearing officer. Apparently, as he perceived these proceedings to be progressing to his disadvantage and having resolved arrangements relative to an early retirement, Mr. McKenney then cooperated in expediting the conclusion of those proceedings and retired from judicial office. To that extent, Mr. McKenney did cooperate in the accomplishment of the primary objective of disciplinary action against a judge deemed unfit, by virtue of misconduct in office, for further judicial service — his removal from office.

Regrettably, the instant proceedings require us once again to consider the appropriate sanction to be imposed upon a judge for misconduct in office. This case differs from those others of the past decade in a major respect — the retirement of the judge prior to our opportunity to act upon the commission's recommendations. (Two other judges retired from office during the pendency of investigations into their alleged official misconduct. In neither case did the commission or the committee thereafter submit a report recommending disciplinary action by this court.) Nevertheless, the retirement or resignation of a judge accused of misconduct in office does not terminate our authority or responsibility to consider imposition of further sanctions relative to his continuing status as a member of the bar. Our statutory and constitutional obligations for general superintendence of the judiciary and of the bar extend simultaneously to both. A truncation of inquiry along one avenue does not operate as a bar to further inquiry along the other. To the contrary, the circumstances surrounding a re-

tirement from or resignation of judicial office may, as in this case, compel further consideration of professional discipline.

We take no pleasure in the necessity of recounting prior incidents of judicial misconduct by a judge, especially since to do so may have the unintended result of reflecting adversely and, if considered out of context, unfairly upon the performance, diligence, and integrity of the overwhelming majority of judges. Nevertheless, for consistency and, prospectively, for predictability, it is necessary to touch briefly upon other cases in arriving at an appropriate disposition of the matter now before us.

At the outset of our consideration of this aspect of the matter before us, we take notice of Mr. McKenney's seemingly reckless disregard of the explicit warnings of our previous decisions and of the clear import of the Code of Judicial Conduct, S.J.C. Rule 3:09, as appearing in 382 Mass. 808 (1981). In this regard, Mr. McKenney's arrogant pursuit of a course of improper behavior has not only destroyed his once-promising judicial career but, in the process, has also brought his judicial office into disrepute and eroded public confidence in the impartiality and integrity of the judiciary. Moreover, his insensitivity to the involvement, directly or indirectly, of others subject to his supervision in various aspects of his misbehavior leaves a residue not entirely purged by his departure from office.

In the past decade, we have found it necessary to disbar two judges for misconduct in office. See *Matter of Troy,* 364 Mass. 15 (1973); *Matter of DeSaulnier,* 360 Mass. 787 (1972). In both cases, the disbarments came after evidentiary proceedings before the full bench of this court in which the respondent judges persisted in protestations of innocence and while, during such proceedings — and in one instance, after such proceedings — both judges attempted to retain their judicial offices. In *DeSaulnier,* in addition to other items of misconduct, we found that the judge conspired to influence the disposition of criminal charges pending before another judge in the expectation, if not the actual receipt, of "some form of consideration or benefit." *Matter of DeSaul-*

*nier, supra* at 807. Mr. McKenney's admitted misconduct does not rise to this level of seriousness, although the acquisition of the Volkswagen automobile does raise questions whether, in that instance, his disposition of the charges against that automobile's prior owner was motivated in part by the opportunity for subsequent personal gain. In certain respects, the circumstances surrounding the acquisition of the Volkswagen automobile present some of the more troubling charges against Mr. McKenney in that they trench upon the performance of judicial duties in the disposition of criminal charges. However, the "Agreed Statement of Facts" is less than definitive with respect to this charge. In some particulars, Mr. McKenney and the two witnesses (a court officer and the defendant-owner of the Volkswagen) are in total or basic agreement. Yet, with respect to others, they disagree completely or, at the least, differ in their memories of the incident. In effect, the "Agreed Statement of Facts," with respect to pivotal facts relative to the acquisition of the Volkswagen automobile, contains, by agreement, recitations of conflicting testimony whose resolution presents issues of credibility not resolvable on the basis of the record now before us.

In *Troy,* we found the judge to have engaged in a variety of misconduct warranting severe disciplinary action. Moreover, we found that the judge in that case, in the course of conduct complained of and in his testimony under oath before the full bench of this court, repeatedly lied in an attempt to secure personal benefits, to retain judicial office and to evade all punishment for his misconduct. To the contrary here, Mr. McKenney has forfeited his former judicial office, acquiesced in the imposition of a public censure and, in the "Agreed Statement of Facts," admitted to basic elements of, at least, some of the charges against him.

In those other cases in which we have determined a censure to be the appropriate sanction, the imposition of that sanction has frequently, but not always, been accompanied by some additional sanction. *Matter of Scott,* 377 Mass. 364 (1979) (judge censured and indefinitely prohibited from

sitting on certain types of cases and made ineligible for assignments to specifically identified courts). *Matter of Bonin,* 375 Mass. 680 (1978) (judge censured after involuntary temporary suspension from office). *Matter of Larkin,* 368 Mass. 87 (1975) (judge censured after voluntary suspension from office during course of proceedings and ordered to pay costs of proceedings). *Matter of Morrissey,* 366 Mass. 11 (1974) (judge censured and ordered to pay costs of proceedings). *Matter of DeSaulnier, supra* (a second judge censured only). In none of the cases in this category was the imposition of a censure conditioned, as in this case, upon the forfeiture of judicial office and, in only one of them, *Matter of Bonin, supra,* did subsequent nonjudicial proceedings lead to a resignation from office.

We attempt no futile exercise to compare with abstract exactitude Mr. McKenney's misconduct with that of other judges whom we have censured but not disbarred for misconduct in judicial office. Such a comparative exercise would serve no useful purpose. The import of our repeated comments on the consequences of a judge's failure to comply with the demanding standards attendant to the acceptance of judicial office is clear and, unfortunately, cumulative. Precisely because Mr. McKenney had the benefit of our instructive comments in earlier decisions, the instant case presents an especially close issue.

Nevertheless, in view of the entire record now before us, and in view of Mr. McKenney's belated cooperation in a reparative resolution of the situation caused by his misconduct, we do not consider it necessary, in discharging our duties relative to the protection of the public, to order his suspension or disbarment.

In reaching this conclusion, we have placed substantial weight on the many mitigating factors (summarized in note 3, *supra*) presented to the court by Mr. McKenney through his counsel. We have balanced his admitted acts of serious misconduct in judicial office against his record of many years of consistent service to his country, his State, and his community. His long record of service, together with the

impact upon him of the extended disciplinary proceedings before the commission and this court, support reasonable expectations that his performance as a lawyer will accord with the ethical standards imposed upon the members of the bar.

In extending appropriate weight and respect to the board's recommendation of disbarment, we have observed that proceedings subsequent to the board's recommendation have made it clear to us that the board, understandably, was not aware that the commission, under its rules, could have, but did not, urge upon this court that disciplinary action be taken against Mr. McKenney in his capacity as an attorney. We have also observed, as the board has made plain, that the board considered only the statement of agreed facts in which Mr. McKenney joined, and did not consider the mitigating circumstances which subsequently became available.

We reiterate our emphatic condemnation of the manner in which Mr. McKenney abused his judicial office and flouted the ethical standards of that office. Nevertheless, in all the circumstances, including more than two and one-half years of litigation which Mr. McKenney has incurred in these proceedings, and including a well-publicized censure, which was conditioned upon his withdrawal from the bench, we conclude that this matter shall be closed without further disciplinary action addressed toward his status as a member of the Massachusetts bar. The Clerk of the Supreme Judicial Court for the Commonwealth is instructed to transmit to the board an appropriate notice to this effect.

*So ordered.*

APPENDIX A

AGREED STATEMENT OF FACTS

A. *CONDUCT RELATING TO USE, ACQUISITION AND REGIS-
   TRATION OF 1978 CADILLAC SEVILLE*

1. In December 1977, Judge McKenney purchased a 1978 Cadillac
   Seville through the assistance of his long-time friend and neigh-
   bor Essue Covington, a General Motors employee.
2. Essue Covington lived on the same street as Judge McKenney,
   was employed by General Motors and was entitled to purchase
   General Motors automobiles at a substantial discount.
3. During 1977, Judge McKenney discussed with Mr. Covington
   obtaining a new Cadillac Seville for Judge McKenney. As a
   General Motors employee, Essue Covington was entitled to buy,
   at a substantial discount, one new car per model year for his per-
   sonal use or the use of his family. This privilege could not be ex-
   ercised on behalf of friends such as Judge McKenney, and Essue
   Covington was obligated to retain the vehicle for not less than
   six months.
4. At Judge McKenney's request, Mr. Covington ordered a 1978
   Cadillac Seville from General Motors with sun roof, leather
   seats and wire wheels as options (Exh. 1). The suggested retail
   price was $16,603. The total cost to a General Motors employee
   was $12,265. This was the amount paid by Judge McKenney.
   The car was to be delivered to a Cadillac automobile dealership
   in Boston.
5. The car arrived at the dealership about December 7, 1977.
   Essue Covington visited Judge McKenney at the Roxbury Dis-
   trict Court and was given two cashier's checks to pay for the car
   — one for $10,629 (Exh. 2), the proceeds of a bank loan and one
   for $1,750 (Exh. 2A), the proceeds of the sale of Judge McKen-
   ney's 1973 Cadillac. Essue Covington took the checks (which
   totalled $12,379) to the dealership, paid $12,265 for the car and
   received a check payable to him of approximately $114 (Exh. 3).
   Essue Covington signed a receipt for the car (Exh. 4) and drove
   the car to the Roxbury District Court and delivered it to Judge
   McKenney.
6. At the time the 1978 Seville was delivered to Essue Covington,
   the dealership, as part of its usual course of business, completed
   the RMV-1, an Application for Registration which showed
   Essue Covington as the purchaser, the purchase price of
   $12,265, and the 5% sales tax due as $613 (Exh. 5).

7. The typed RMV-1 prepared by the dealership was given to Essue Covington who delivered it to Judge McKenney (Exh. 5). Judge McKenney did not register the Cadillac in accordance with this typed RMV-1, nor did he register it for seven months thereafter.

8. In December 1977, Judge McKenney accepted a suggestion of a court officer to borrow repair plates to use on the Cadillac. Using repair plates, he operated the Cadillac until June 26, 1978 without registering it.

9. From December 8, 1977 to the end of 1977, Judge McKenney used 1977 repair plate 4753A which a court officer obtained from a friend in Sudbury. The court officer obtained a 1978 plate (Repair Plate 4753B) from the same friend and that plate was used until June 26, 1978.

10. Judge McKenney did not register the Cadillac in his name in December 1977 because he wished to protect Essue Covington from violating the General Motors policy which required that employees buying new cars keep them for at least six months.

11. If Judge McKenney registered the Cadillac in his own or Essue Covington's name in December 1977, a sales tax on $12,265 would then have been due. Judge McKenney did not pay a sales tax in December 1977. At the time he received the car in December 1977, Judge McKenney's intention was to register it in his own name six months later. In June 1978, Judge McKenney paid a sales tax on $8500 on the transaction set forth in paragraph 13, *infra.*

12. In June 1978, Essue Covington wanted to buy a 1979 General Motors car for himself and advised Judge McKenney that he should register the car in his (Judge McKenney's) own name.

13. About June 26, 1978, Judge McKenney dictated and had typed in his office a Bill of Sale which stated that Essue Covington "as a representative of General Motors — Cadillac Motor Division" sold the Cadillac to Kathleen McKenney on that date for $8,500 (Exh. 6) and that the amount had been paid in full. No such sale took place on that date. Judge McKenney did not pay $8,500 to Essue Covington at that time. Essue Covington was not a representative of General Motors or of the Cadillac Motor Division. The signature that appears on the Bill of Sale (Exh. 6) is not the signature of Essue Covington and the evidence did not disclose who affixed that signature.

14. The Bill of Sale purported to be notarized before an employee in the Roxbury District Court Clerk's Office. The employee had no memory of notarizing Essue Covington's signature or any Bill of Sale to Kathleen McKenney.

15. Judge McKenney denied that the instrument of June 26, 1978 was a Bill of Sale and described it as an ."instrument of convenience".

16. On or about June 26, 1978 Judge McKenney instructed the same court officer who had obtained the repair plate to register the Cadillac Seville. The court officer went to the insurance company to obtain insurance. The RMV-1 prepared earlier by the dealership (Exh. 5) was not used in the registration. Another RMV-1 was received by the court officer from Judge McKenney showing that the car had been sold on June 26, 1978 by the dealership to Kathleen McKenney for $8,500 (Exh. 7). The dealership was not in business in June 1978. The RMV-1 bore the purported signature of the manager of the dealership but the name was misspelled and the signature was not genuine. The evidence did not disclose who affixed that signature.

17. The court officer took the Bill of Sale and the RMV-1 (Exhs. 6, 7) to the Registry together with two blank checks from Judge McKenney, one to pay sales tax and one for registration fees. Because of the notarized Bill of Sale containing the description of Essue Covington as a representative of General Motors, the Registry accepted the figure of $8,500 which was stated in the Bill of Sale as the purchase price and registered the car.

18. In June 1978, the automobile had been driven 9,000 miles by Judge McKenney. At the time of the registration in June 1978, the Department of Corporations and Taxation would have imposed a sales tax based upon the list price less ten per cent in the absence of the notarized Bill of Sale.

19. In January 1979, the insurance company paid Judge McKenney $11,896 as the fair value of the Cadillac which had been inundated by water at Harbor Towers (Exh. 8).

B. *CONDUCT RELATING TO ACQUISITION OF 1963 VOLKS-WAGEN*

1. On December 15, 1977, William E. Gearhart (Gearhart) was present for arraignment in the Roxbury District Court on four complaints: operating an unregistered vehicle; operating an uninsured vehicle, operating without a valid driver's license and operating without a registration in his possession.

2. Gearhart had been stopped by an M.D.C. policeman on November 11, 1977 and his 1963 Volkswagen was towed from Charlesgate East and was stored at a Brighton towing company.

3. When he appeared before Judge McKenney on December 15, 1977, Gearhart had accumulated towing costs and thirty-four days of storage charges. Gearhart lived in the Back Bay, parked in the street and had accumulated eleven unpaid parking tickets in various parts of the City of Boston. The parking tickets were not before the Roxbury District Court on December 15, 1977.

4. Before appearing in court, Gearhart considered that he faced storage and towing charges of a couple hundred dollars, possible fines of $100 or more and approximately $110 in parking tickets. Gearhart was without sufficient funds to pay any substantial fine which might be imposed or any substantial storage costs or parking tickets.

5. Before the case was called, Gearhart talked with the prosecuting officer about the charges. Gearhart testified that he was advised that the charges were serious and could result in a criminal record. Gearhart, who had never been in court before and was nervous and uncomfortable, asked the officer what to do. The officer advised him to address the Court and Gearhart decided to do so. Gearhart stated that he wanted to minimize any exposure or expense and that he wished to make a deal whereby he would give up the Volkswagen and the charges would be dismissed. The officer also told Gearhart that the Volkswagen was worth at least $500 and tried to persuade him not to abandon it. The officer said that if the automobile was given up it was his experience that Judge McKenney would place the cases on file. Gearhart had come to Court that morning prepared to "relinquish" the Volkswagen in lieu of paying any money.

6. When the case was called, Gearhart immediately addressed the Court and told Judge McKenney that the car had been impounded, that he "relinquished" it. His intention was that he was "relinquishing" it to the Commonwealth. Judge McKenney asked what he meant by "relinquished" and whether there had been a bill of sale. There was testimony that Judge McKenney also asked what kind of car was involved and how much it was worth. Gearhart said it was a Volkswagen in good condition and in his opinion worth about $450. Judge McKenney indicated there were persons interested in that kind of car and that perhaps even someone in the courtroom might buy it. He instructed Gearhart to go outside with a court officer and work out the matter. The case was then suspended and a recess occurred at sometime before lunch.

7. The colloquy between Judge McKenney and Gearhart was of some amusement to the spectators and lawyers in the courtroom and there was laughter and comment from some of the lawyers in the front rows.

8. After the proceedings described in paragraph 6, Gearhart met with the court officer in a room outside the courtroom. Gearhart agreed to give the court officer a Bill of Sale for $1.00. A Bill of Sale was written out and signed by Gearhart. Before he signed, Gearhart asked what would happen to the charges against him and the amounts Gearhart considered to be owed by him.

9.  According to Gearhart's testimony, the court officer assured him that the charges would be filed. According to the court officer, he said he would check with Judge McKenney, did so, was advised by Judge McKenney that the charges would be filed, and returned to give this information to Gearhart. Judge McKenney denied this conversation with the court officer.

10.  Judge McKenney and the court officer had a conversation during the recess. According to the court officer, he asked the Judge what to do about the defendant with the 1963 Volkswagen which had towing and storage charges and the Judge said that the court officer should buy the car and then sell it back to him (Judge McKenney). According to the Judge, the court officer said that he wanted to buy the Volkswagen and that "it would be a good car for us on the island" (a reference to Martha's Vineyard where the Judge operated a charter fishing business and the court officer owned land), and the Judge testified he said "OK" in response to the court officer's statement and did not see anything wrong in the court officer's buying the car.

11.  When Gearhart signed the Bill of Sale, he believed that the charges against him would be filed and that he would have no further expense by way of tickets, storage charges or towing expenses. In his mind, he had estimated $100 or more in possible fines (no fines were in fact ever imposed); $100-$150 in storage (34 days); $20 in towing charges and about $110 in parking tickets. He therefore believed that the value of his car was approximately equal to this total aggregate expense.

12.  Gearhart testified that the court officer returned and told him the charges would be filed. Gearhart gave the court officer the key to the Volkswagen and left with the assurance he could later pick up his personal effects from the car.

13.  Gearhart believed that he had made an arrangement whereby his surrender of the car satisfied all obligations to the Court and the towing company arising out of the criminal charges against him and the parking violations which he thought were outstanding.

14.  According to the court officer, he returned to Court after Gearhart left, and was asked by Judge McKenney if the matter had been taken care of. The court officer said it had.

15.  Judge McKenney had no memory of the events which took place in the courtroom that day and did not remember the case or Gearhart.

16.  The court officer called the Brighton towing company about the Volkswagen. Because the car was unregistered and uninsured, MDC permission had to be obtained to release the car. The court officer asked a police sergeant at the Court to arrange this

release. The towing company records show an MDC clearance (Exh. 9).

17. According to the court officer, he and another court officer picked up the Volkswagen that day at the towing company and returned it to the courthouse, parking it in the courthouse parking lot, and he told Judge McKenney he had obtained the car and showed it to him.

18. The 1963 Volkswagen had some body damage and according to the court officer, at Judge McKenney's request, he took the car to a body shop where the car was later repaired and Judge McKenney reimbursed the court officer for the expense. The owner of the body shop returned the Volkswagen to the Roxbury District Court parking lot.

19. All charges against Gearhart were placed on file without a finding (Exh. 10A-D) and no costs or fines were ever imposed on him.

20. Sometime before December 29, 1977, the court officer gave Judge McKenney a Bill of Sale from him to Judge McKenney in the amount of $50, the amount paid to the Brighton towing company. Judge McKenney testified that the court officer either made him a gift of the car or that he reimbursed the court officer for the amounts spent by him. An unsigned copy of the Bill of Sale (Exh. 11) from the court officer to Judge McKenney was produced by Judge McKenney. A copy of the $1 Bill of Sale from Gearhart to the court officer was not produced either by the court officer or Judge McKenney. Gearhart testified that he did not keep a copy.

21. About December 29, 1977, the court officer was instructed by Judge McKenney to register the Volkswagen. He went to the office of the insurance company with the Bill of Sale to Judge McKenney and completed the RMV-1 which showed a transfer of the Volkswagen from the court officer to Judge McKenney (Exh. 12). The court officer signed Judge McKenney's name. The court officer then took the papers to the Registry and registered the Volkswagen in Judge McKenney's name with the principal place of garaging at Oak Bluffs. The court officer paid the registration fees and sales tax by checks and Judge McKenney later reimbursed him in cash. The registration transferred to the Volkswagen was MS-38, a vanity plate Judge McKenney had previously been issued.

22. When the court officer returned from the Registry, he gave Judge McKenney the Volkswagen registration which was the yellow copy of the RMV-1. Judge McKenney thereafter immediately loaned or gave the vehicle to female probation officer [Marcia S.] for her use in going to college.

23. The 1963 Volkswagen was registered and insured in 1978 in Judge McKenney's name and he paid the insurance premiums for 1978. Probation officer [Marcia S.] used the Volkswagen continuously in 1978 and it was still in use at the time of the hearing.

24. On June 24, 1978 Judge McKenney dictated a Bill of Sale selling the Volkswagen to probation officer [Marcia S.] and stating a payment of $100.00 (Exh. 13). There was no actual sale of the Volkswagen on that date and no money was paid.

C. *CONDUCT RELATING TO PROBATION OFFICER [MARY B.]*

1. Probation officer [Mary B.] would invoke her Fifth Amendment privilege against self-incrimination and refuse to testify.

2. [Mary B.] was switchboard operator at the Roxbury District Court when Judge McKenney first met her. She was then 23 years old and a night student at the University of Massachusetts.

3. [Mary B.] did not have a college degree when Judge McKenney gave her her first 90-day appointment as a temporary probation officer on January 30, 1975 (Exh. 14).

4. On April 14, 1975, Judge McKenney reappointed [Mary B.] as a temporary probation officer for a second 90-day period commencing on April 16, 1975 (Exh. 15).

5. On July 15, 1975, Judge McKenney gave [Mary B.] a third appointment as a temporary probation officer until October 15, 1975 (Exh. 16).

6. In November 1975, Judge McKenney made a fourth 90-day temporary appointment of [Mary B.] as a probation officer until January 15, 1976 (Exh. 17).

7. On January 26, 1976, Judge McKenney made a fifth 90-day temporary appointment to [Mary B.] to April 13, 1976 (Exh. 18).

8. The five separate 90-day temporary appointments given to [Mary B.] permitted her to obtain the one year of social service work necessary to qualify for appointment as a probation officer.

9. On April 14, 1976, Judge McKenney appointed [Mary B.] a permanent probation officer. She had received her college degree at that time (Exh. 19). All of Judge McKenney's appointments of [Mary B.] were approved by the Commissioner of Probation.

10. In September 1978, Judge McKenney submitted [Mary B.]'s name for approval for designation as an Assistant Chief Probation Officer (Exh. 20). The Commissioner of Probation responded that Judge McKenney would be required to provide additional information for consideration of approval (Exh. 21).

That further information was never provided and the appointment was never approved or disapproved.

11. Judge McKenney visited [Mary B.] at her home in the evenings in 1977 and 1978 at the rate of approximately once a month.

12. Judge McKenney visited [Mary B.]'s home and was an overnight guest on two or three occasions. [Mary B.] accompanied him on a one-day fishing trip to Hyannis in 1978.

13. In December 1978, Judge McKenney went to Bermuda and was accompanied by Ms. [B.]. They stayed at a two-bedroom suite in the Southhampton Princess which was provided by a [Boston travel company].

14. Judge McKenney testified that [Mary B.] accompanied him to Bermuda as his "nurse". He denied any sexual relations.

15. [Mary B.] accompanied Judge McKenney to Anthony's Pier Four on one occasion and to the Harvard Club on "a couple of occasions", and she was a guest at luncheons in Judge McKenney's chambers.

16. [Mary B.]'s employment was consistent with a minority recruitment program being carried out in the Roxbury District Court.

D. *CONDUCT RELATING TO PROBATION OFFICER [MARCIA S.]*

1. Probation officer [Marcia S.] would invoke her Fifth Amendment privilege against incrimination and refuse to testify.

2. [Marcia S.] was first appointed as a temporary probation officer on January 4, 1977 (Exh. 22). At that time she had no college degree.

3. [Marcia S.] was reappointed by Judge McKenney for 90 days on April 5, 1977 (Exh. 23) and for 6 months on August 10, 1977.

4. In August 1977, Judge McKenney personally appeared on behalf of [Marcia S.] before the Probation Committee (Exh. 24) after the Commissioner of Probation had declined to approve an extension of her temporary appointment because she had no college degree.

5. After Judge McKenney's appearance, the Probation Committee approved the extension of her temporary appointment conditioned on her obtaining a degree (which was then anticipated in June 1978) (Exh. 25).

6. On April 28, 1978 Judge McKenney appointed [Marcia S.] Temporary Assistant Chief Probation Officer (Exh. 26). At that time she still had not received her college degree.

7. On June 12, 1979 Judge McKenney appointed [Marcia S.] permanent Assistant Chief Probation Officer. At that time she had obtained her degree.

8. [Marcia S.] was permitted by the Chief Probation Officer, with Judge McKenney's awareness, to attend college classes during

the day and through Judge McKenney's efforts, received supplementary income from the grant which funded the pre-trial diversion program.

9. Judge McKenney visited [Marcia S.] at her home after court hours and was an overnight guest there on "a couple" of occasions. He denied any sexual relationship. Judge McKenney further testified that he and [Ms. S.] were once on the same plane for Bermuda and that while there, he took her to lunch.

10. In 1978 and 1979, [Ms. S.] drove the 1963 Volkswagen which had been previously owned by a Roxbury District Court defendant and which had been registered on December 29, 1977 in Judge McKenney's name, and on January 2, 1979 was registered in [Ms. S.]'s name. The plate used was MS-38, a plate issued to Judge McKenney or his family.

11. Before her employment at the Roxbury District Court, [Marcia S.] had been associated with a program for the Diversion of Female Offenders, an LEAA program which resulted in her appearance from time to time in the Roxbury District Court.

12. While employed as a Probation Officer and Temporary Assistant Chief Probation Officer, [Marcia S.] was competent in carrying out her duties as head of the Pretrial Diversion Program in the Roxbury District Court.

### E. CONDUCT RELATING TO COURT OFFICER JOSEPH DRAGO

1. Joseph Drago is a former building superintendent of the Roxbury District Court (job title — "Senior Building Custodian") who became a Court Officer in 1977.

2. From 1952 to 1975 Mr. Drago was employed by the Real Property Department of the City of Boston as a Building Custodian.

3. Contained in the personnel files of the City of Boston is a letter dated 1/14/75 concerning Mr. Drago (Exh. 27). Thereafter, as a result of a doctor's letter (Exh. 28), Drago was placed on leave without pay by the Real Property Department, which, with extensions, lasted more than two years, until Judge McKenney appointed him a Court Officer.

4. Drago's personnel record with the City of Boston is annexed as Exhibit 29.

5. In 1971 as Building Superintendent for the new Roxbury District Courthouse, Mr. Drago first met and later became friendly with Judge McKenney.

6. On April 27, 1977 while Mr. Drago was still on a leave of absence without pay from his job with the Real Property Department, Judge McKenney appointed him a Court Officer at a salary of $264.75 per week.

7. Judge McKenney denied that he had any knowledge of the facts contained in Mr. Drago's personnel file with the City of Boston.

8. In June 1977, Judge McKenney promoted Mr. Drago to Assistant Chief Court Officer (Exh. 30).

9. In 1976 Judge McKenney gave Mr. Drago one of two "tour conductor" airline tickets to Hawaii which Judge McKenney had received from Mr. H. Lowe. Thereafter Mr. Drago accompanied Judge McKenney to Hawaii.

10. Mr. Drago has resided for at least thirty years at 35 Worley Street, West Roxbury. He also rented and lived in penthouse apartment 41E at Harbor Towers, Boston.

11. Mr. Drago gave Judge McKenney a key to the Harbor Towers apartment to be used by Judge McKenney on unspecified occasions. Judge McKenney used the apartment in Drago's absence.

12. Judge McKenney made a trip to Washington in 1978 at Mr. Drago's expense to speak personally with Senator Brooke about assisting Mr. Drago's business — "Creative Industries of Boston" — in its relationship with the General Services Administration.

13. On July 14, 1978 Mr. Drago entered the Faulkner Hospital with symptoms of acute appendicitis. Surgery was performed on July 15, 1978. Mr. Drago underwent further surgery on July 20, 1978. Mr. Drago was discharged from the hospital on August 1, 1978. He did not return to work until December 8, 1978 although he was seen in the Courthouse in October 1978.

14. Judge McKenney testified that shortly after Drago's operation he visited him in the hospital. Drago was still seriously ill and had tubes inserted in various parts of his body. Judge McKenney further testified that he asked Drago whether he had sufficient sick leave and Drago replied that he did.

15. On October 26, 1978 Judge Baron Martin, who had assumed some of the administrative duties in the Roxbury District Court, asked Mr. Drago to substantiate his claim of accrued sick leave (Exh. 31).

16. Judge Martin requested three times that Mr. Drago produce substantiation but by January 2, 1979, Mr. Drago had not done so. Judge Martin then advised Mr. Drago that he had no alternative but to assume that no substantiation existed (Exh. 32).

17. A doctor's letter of December 8, 1978 with respect to Mr. Drago's availability for work (Exh. 33) was unsatisfactory to Judge Martin, and another letter was received dated January 22, 1979 saying Drago "was allowed to return to part-time work on December 8, 1978".

18. Following Exh. 32 from Judge Martin, Mr. Drago delivered a document dated November 21, 1978 addressed to "To Whom It May Concern" from a Mr. Thomas Gately of the Real Property

Department of the City of Boston (Exh. 34) which stated that Drago had accumulated 148 days of sick leave.

19. Mr. Gately has no recollection of having signed that document, and the document does not contain his proper title. Mr. Gately acknowledged that his signature was genuine.

20. The "To Whom It May Concern" memo signed by Mr. Gately was not in the personnel files of Mr. Drago at the Real Property Department of the City of Boston, and was not seen by Judge McKenney until after January 2, 1979.

21. No time records or time cards or other original records as of 1977 were located showing that Drago had 148 days of accumulated sick leave from his City of Boston employment.

22. Neither Judge McKenney nor anyone at the Roxbury District Court had requested Mr. Drago's sick leave record or his employment record from Boston City Hall, nor was there any communication between City Hall and the Roxbury District Court on these subjects.

23. Judge McKenney never discussed Mr. Drago's accrued sick leave with Chief Court Officer Bush.

24. During his testimony in December, 1979, Mr. Drago produced a certificate by Chief Court Officer John Bush (Exh. 35) purporting to be an extract from records kept by Bush in 1978. Mr. Drago's six-month absence is not noted in the original records kept by Chief Court Officer Bush.

25. Between July 1978 and December 1978 and at other times, Judge McKenney routinely signed payroll records for the employees of the Roxbury District Court. These records included the name of Joseph Drago without any indication or notation that Mr. Drago was sick or otherwise absent. Mr. Drago was paid for the entire period July - December 1978 during which he was absent due to illness.

26. Judge McKenney's signature on the Roxbury District Court payroll followed the certification which stated that ". . . The persons listed on this roll were employed during the payroll period covered by the roll and actually performed the duties and employments indicated. . ."

F. *CONDUCT RELATING TO THOMAS J. HANNON, ESQ.*

1. Judge McKenney first met Attorney Thomas J. Hannon at a barbecue in 1972;

2. Mr. Hannon has been present in various establishments such as Charlies Eating and Drinking Saloon on Newbury Street and Baxters (on Cape Cod) where Judge McKenney was also present;

3. Judge McKenney and Mr. Hannon were part of a group of boat owners who socialized on some summer weekends;

4. Mr. Hannon was present at luncheons served in Judge McKenney's chambers in the Roxbury District Court.
5. Mr. Hannon and his family visited Judge McKenney on Christmas Eve 1979;
6. Judge McKenney has spent "a good deal of [his] leisure hours with. . . . [Attorney] Hannon";
7. Mr. Hannon was appointed as counsel for indigents at least 57 times in 1978 not including appointments in October and November 1978. Records for those two months are missing but the average number of appointments for the preceding six months was six per month.
8. Mr. Hannon was suggested by Judge McKenney to non-indigent defendants which resulted in Mr. Hannon's engagement as counsel. There is no record of the number of such occasions.
9. In 1976, nineteen lawyers received compensation in excess of $2,000 for the representation of indigents. Mr. Hannon received $3,612.50 which was the ninth largest amount received. Four lawyers received more than $4,000.
10. In 1977, nineteen lawyers received compensation in excess of $2,000 for the representation of indigents. Mr. Hannon received $4,992.50 which was the fourth largest amount received. Three lawyers received more compensation, i.e., $10,300.00, $9,029.00 and $5,157.00.
11. In 1978, twenty lawyers received compensation in excess of $2,300 for the representation of indigents. Mr. Hannon received $6,287.50 which was the seventh largest amount received. Four lawyers received $10,000 or more, and two other lawyers received $7,571.50 and $6,382.00 respectively.

G. *CONDUCT RELATING TO THE TAPE RECORDING OF ARRAIGNMENTS*

1. Judge McKenney's announced policy was that there would be no tape recording in the arraignment session over which he presided. His policy with respect to refusal to permit tape recording was well known to lawyers who appeared before Judge McKenney and he made no effort to conceal it.
2. Judge McKenney never permitted the tape recording of a police officer's testimony at an arraignment and, on his own motion, never tried tape recording the arraignment session to see how it would work.
3. The evidence indicated one specific request of Judge McKenney for tape recording an arraignment in late October 1978. In that case Judge McKenney did not permit the tape recording in his session but sent the matter to another session to be tape recorded.

4. Judge McKenney's reasons for refusing tape recording were that it delayed the arraignment session, was impractical because it would require records such as probation and clinical reports to be read into the record and that tape recording interfered with his working out flexible solutions to cases before him.

H.  *CONDUCT RELATING TO SERVICES OF COURT OFFICERS*

1. Court officers performed numerous personal errands for Judge McKenney including:

a.  Taking Judge McKenney's cars to the service station, garage or dealer for washing, servicing or maintenance; taking papers to the insurance company and to the Registry to effect insurance and registration for Judge McKenney; obtaining repair plates for use on the Cadillac.

b.  Preparation and serving of meals at the Roxbury District Court including setting up of the table, food preparation and assistance in cooking, clearing tables, washing dishes, buying food and keeping accounts.

c.  Picking up and delivering packages and personal property.

2. Judge McKenney was a gourmet cook and did the major part of the cooking for the luncheons at the Roxbury District Court.

3. The luncheons at the Roxbury District Court were attended by Judges, some probation officers, some court officers, business persons, community leaders and other personalities. There was no evidence that the cost of food was paid from public funds.

4. Judge McKenney testified that the court officers performed the above services in order to conserve his time for judicial services and because he was concerned about judges venturing into the Roxbury community during lunch and dinner hours.